**REEDEREI FRANZ HAGEN, for its own use and for the use of Verein Bremer Seeversicherer e.V., Plaintiffs,**

v.

**DIESEL TUG RESOLUTE, her engines, boilers, etc., in rem, et al., Defendants.**

Civ. No. 73-907-H.

United States District Court,
D. Maryland.

Sept. 22, 1975.

Manfred W. Leckszas, John T. Ward and Ober, Grimes & Shriver, Baltimore, Md., for plaintiffs.

John D. Alexander, George W. Constable and Constable, Alexander & Daneker, Baltimore, Maryland, for defendants Diesel Tug RESOLUTE and Baker-Whiteley Towing Co.

John H. Skeen, Jr. and Skeen & Roach, Baltimore, Md., for defendants Anthony H. Gentile and Bernard F. Freburger.

ALEXANDER HARVEY, II, District Judge:

In this admiralty action, the owners of the MV OTTO PORR and the insurer of its hull seek to recover damages because of a grounding which allegedly occurred following undocking of this vessel at the Curtis Bay Ore Pier in the Port of Baltimore. Named as defendants are the tug RESOLUTE, its owner, Baker-Whiteley Towing Co. (hereinafter Baker-Whiteley) and the tug's master and mate, Anthony H. Gentile and Bernard F. Freburger.

Suit was originally brought by the OTTO PORR's owner, Reederei Franz Hagen (hereinafter Hagen), a German corporation with offices in Hamburg, West Germany. Verein Bremer Seeversicherer, a German firm with offices in Bremen, West Germany, was added as a use plaintiff because it had insured the hull of the OTTO PORR and paid for repairs to the vessel's rudder and steering engine.

On April 26, 1973, after the OTTO PORR had completed the loading of a cargo of chrome ore at the Curtis Bay Ore Pier, the tug RESOLUTE assisted in undocking her.[1] The tug's services had been furnished pursuant to a written towage contract between Hagen and Baker-Whiteley. During the operation in question, defendant Gentile, who was master of the tug RESOLUTE, was on board the OTTO PORR and acted as docking master. Defendant Freburger, who was mate of the RESOLUTE, remained aboard the tug at the time as her acting master.

Before the operation commenced, the OTTO PORR had been moored port side to the Curtis Bay Ore Pier, bow in, and the RESOLUTE had been made up to the vessel's starboard bow. Using both the OTTO PORR's and the tug's engines and rudders, the vessel was backed into the Curtis Bay Ore Pier channel and then was turned 180° by the tug counterclockwise somewhere in the channel between the Ore Pier and the Coal Pier.[2]

Following the turning operation, the OTTO PORR, which was now turned around and heading out, proceeded on its own power and under the direction of a Bay Pilot down the Curtis Bay Channel to the Patapsco River and then down river for approximately nine miles. The Bay Pilot then observed that the vessel's rudder angle indicator was not registering correctly and so advised the master, Captain Helmut Fenske. Following an investigation, Captain Fenske found that the steering gear was damaged, where-

1. The vessel was destined for Cork, Ireland.

2. The channel end of the Coal Pier is approximately 1200 feet from the end of the Ore Pier, proceeding in a southeasterly direction.

upon he called for the assistance of tugs and returned the vessel to the pier. Later inspection revealed damage to the rudder, steering gear and steering engine, which necessitated extensive repairs before the vessel could resume her normal operations.

Plaintiffs contend that during the turning operation, the OTTO PORR grounded at the edge of or outside the Curtis Bay Ore Pier approach channel. Asserting that the grounding was caused by the negligence of the defendants Gentile and Freburger and by the unseaworthiness of the tug RESOLUTE, plaintiffs here seek damages from the individual defendants and from Baker-Whiteley, which owned the tug in question and employed defendants Gentile and Freburger. Damages in the amount of $108,108.68 are claimed, representing costs paid by the owner of the OTTO PORR and its insurer for repairs to the vessel, losses for detention of the vessel and other charges incurred as a result of the alleged grounding and the subsequent repair work. By agreement of the parties, the issues of liability have been tried separately, with questions relating to the determination of the amount of damages being reserved for later trial, if necessary.

Defendants contend that the evidence is insufficient to show that any grounding at all occurred shortly after the OTTO PORR was undocked. Claiming that there is no direct evidence that the vessel's rudder struck bottom outside the Ore Pier channel, defendants assert that the damage, which was discovered shortly after the undocking operation, occurred either before defendants assisted in the undocking of the OTTO PORR on April 26, 1973 or after the undocking

and turning had been completed. As a further defense, defendant Baker-Whiteley argues that even if defendant Gentile were negligent, no recovery can be had against it because of exculpatory provisions of the pilotage clause included in the contract of towage. Defendant Gentile relies on a similar exculpatory clause contained in the agreement between him and the shipowner for the performance of his services as docking master. Defendant Freburger contends that proof is lacking that he was negligent in any way.

I

*Negligence of Defendant Gentile*

At the lengthy trial,[3] the evidence relating to the cause of the damage to the OTTO PORR's rudder and steering gear was sharply conflicting. Plaintiffs produced proof that at the direction of defendant Gentile, who was on board the OTTO PORR at the time, the vessel was turned around by the tug RESOLUTE at a location in the Curtis Bay Ore Pier approach channel where the channel was not wide enough for the turning maneuver. If the testimony of plaintiffs' witnesses is accepted, it would appear that the stern of the OTTO PORR ran outside the channel while the vessel was being turned and that the rudder was thereby caused to ground and remain locked in position while the tug pushed the vessel's bow counterclockwise and turned it completely around.[4] Were the vessel turned at or near the location where plaintiffs' proof indicates the turning actually occurred, plaintiffs would quite clearly have satisfied their burden of proving that defendant Gentile was negligent in deciding, while acting as docking master on board the

---

3. The non-jury trial lasted some seven days, not including final argument which was held after the filing of extensive post-trial briefs. More than 70 exhibits were admitted in evidence.

4. The OTTO PORR was 317.75 feet long with a beam of 53 feet. Her draft was 23 feet 3 inches forward and 24 feet 11 inches

aft. The channel alongside the Ore Pier is 150 feet wide. The channel itself is dredged to a sufficient depth for safe passage by the OTTO PORR, but once outside the channel, shallow water is immediately encountered, particularly along the northeastern edge of the channel where plaintiffs contend the vessel grounded.

OTTO PORR, to maneuver the vessel in this part of the channel.

On the other hand, defendants have produced proof indicating that the OTTO PORR was in fact turned very near the Coal Pier, where the channel widened out and the depth of the water on both sides was such that no grounding would in fact have occurred. Defendants assert that at the time the grounding allegedly occurred, no one on the vessel noticed any bump, jolt or other physical indication that any part of the OTTO PORR struck bottom. Defendants point out that the vessel proceeded for some nine miles before Captain Fenske discovered damage to the steering gear, and they contend that the damage which occasioned the repairs in question occurred either before the undocking maneuver during other voyages of the OTTO PORR, or after the RESOLUTE and its crew had finished the undocking and turning maneuver.

■ On the record here, this Court finds that the OTTO PORR did go aground on April 26, 1973 during the turning maneuver. The actual location in the channel where the vessel was turned, although between where plaintiffs' witnesses placed it and defendants' witnesses placed it, was quite close to the spot shown by plaintiffs' proof. The credible evidence indicates that the vessel was too long to be turned at that location, that the stern ran out of the channel and that the vessel's rudder grounded during the turning maneuver, with resultant damage to the rudder, steering gear and steering engine. The evidence produced was circumstantial, but with due regard to the credibility of the witnesses, this Court is satisfied that plaintiffs have met their burden of proof as to this issue.

This Court further finds that defendant Gentile was negligent in deciding, while he was acting as pilot and docking master of the OTTO PORR, to turn the vessel at the location in the channel where it was in fact turned and that such negligence was the sole proximate cause of the damage to the vessel. In the exercise of due care, Gentile should not have ordered the turning at this location where the depth of the water was such that this vessel could not have been turned completely around without striking bottom.

It is not necessary in this case to resolve the many disputed subsidiary issues of fact or to make more detailed findings concerning the issue of defendant Gentile's negligence. This Court would observe, however, that it found quite unconvincing the extensive evidence produced by defendants in an attempt to show other possible causes for the damage to the OTTO PORR's rudder. The vessel was a new one and had been in service for less than a year when the damage was discovered. Had the damage in question occurred before April 26, 1973, as suggested by defendants, the vessel could hardly have navigated up the Chesapeake Bay and from its anchorage in the Port to the Curtis Bay Ore Pier, much less across the Atlantic Ocean on previous voyages. Nor is there credible evidence to indicate that the damage occurred after the turning maneuver had been completed and the vessel was under the command of the Bay Pilot.

However, this finding of negligence on the part of defendant Gentile does not result under the circumstances here in a further finding that he or any of the other defendants are responsible in damages to the plaintiffs. The negligent acts of defendant Gentile occurred while he was acting as pilot and docking master on board the OTTO PORR. As such, provisions of both the towage contract and the docking master's agreement must be considered before a final determination of liability can be made. For the reasons more fully discussed hereinafter, this Court concludes that neither defendant Gentile nor any one of the other defendants is liable in damages to the plaintiffs because of any negligent act of Gentile's occurring while he was on board the OTTO PORR

and acting as her pilot and docking master. Baker-Whiteley is relieved of responsibility for any such negligence by the pilotage clause contained in the towage contract between it and Hagen. Captain Gentile is relieved of personal liability for any such negligence by the provisions of the docking master's ticket. Finally, plaintiffs have not proved that defendant Freburger was in any way negligent while he was carrying out Captain Gentile's orders during the turning maneuver.

## II

### The Pilotage Clause

The towage agreement which covered the services rendered by Baker-Whiteley to the OTTO PORR on April 26, 1973 contained a clause relieving the towing company from liability for damages resulting from the negligent performance of pilotage services by its tug captain while acting as docking master. The clause in question provides as follows:

PILOTAGE: We do not furnish pilots or pilotage to vessels making use of or having available their own propelling power, so that whenever any licensed pilot, or a captain of any tug which is furnished to or is engaged in the service of assisting a vessel making use of or having available her own propelling power, participates in directing the navigation of such vessel, or in directing the assisting tugs, from on board such vessel or from elsewhere, it is agreed that he becomes the borrowed servant of the vessel assisted and her owner or operator for all purposes and in every respect, his services while so engaged being the work of the vessel assisted, her owner and operator, and being subject to the exclusive supervision and control of the vessel's personnel. Any such service performed by any such person is beyond the scope of his employment for us and neither those furnishing the tugs or lending any such person, nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any act or omission of any such person. The provisions of this paragraph may not be changed or modified in any manner whatsoever except by written instrument signed by an officer of this company.

Pilotage clauses such as this one have been upheld as valid by the United States Supreme Court. In *Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932), the Supreme Court concluded that a clause such as the one involved in this case is not against public policy and is binding upon the parties to a contract of towage. The Court observed that the validity of a provision such as this one "cannot reasonably be doubted" (at 294, 53 S.Ct. 135). Concluding that a tugboat company's responsibility is not to be extended beyond the service that it undertook to perform, the Court said (at 294–295, 53 S.Ct. at 136):

It [the tugboat company] did not furnish pilotage. The provision that its tug captains while upon the assisted ship would be the servants of her owner is an application of the well-established rule that when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former. *Denton v. Yazoo & M. V. R. Co.*, 284 U.S. 305, 308, 52 S.Ct. 23, 76 L.Ed. 517. It would be unconscionable for petitioner upon occurrence of a mishap to repudiate the agreement upon which it obtained the service.

In the more recent case of *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), the Supreme Court struck down as invalid and against public policy a clause exempting a towing company from liability for the negligent performance of *towing* services. However, the Court found a clear distinction between a pilotage exemption clause and a towage exemption clause and concluded that it was entirely rea-

sonable to hold one valid and the other invalid. In so doing, the Supreme Court in *Bisso* cited and reaffirmed its earlier ruling in the *Sun Oil Co.* case.

Since the *Bisso* decision, lower federal courts have consistently upheld the validity of pilotage clauses in towage contracts and have relieved tugboat companies from liability for negligence of an employee occurring while such employee was acting as pilot of the towed vessel. *A/S ATLANTICA v. Moran Towing & Transportation Co., Inc.*, 498 F.2d 158 (2d Cir. 1974); *Transpacific Carriers Corporation v. Tug ELLEN F. McALLISTER*, 336 F.2d 371 (2d Cir. 1964); *United States v. SS PRESIDENT VAN BUREN*, 490 F.2d 504 (9th Cir. 1973); *Farrell Lines, Incorporated v. BIRKENSTEIN*, 207 F.Supp. 500 (S.D.N.Y.1962); *Federal Steam Navigation Company v. Tugs SAVANNAH and ROBERT W. GROVES*, 305 F.Supp. 1293 (S.D.Ga.1969). The principle involved has been recognized in this District. *Tebbs v. Baker-Whiteley Towing Co.*, 271 F.Supp. 529, 539 (D.Md.1967), *aff'd* 407 F.2d 1055 (4th Cir. 1969).

 Under these authorities, this Court concludes that defendant Baker-Whiteley is not responsible in damages to the plaintiffs for any negligence of its employee, defendant Gentile, while he was acting as pilot and docking (or undocking) master of the OTTO PORR on April 26, 1973. It is settled law in the shipping industry that a tugboat company may rely upon a pilotage clause to avoid such liability. While so serving as a pilot aboard a vessel being assisted by his tug, a tugboat master is presumed to be a "borrowed servant" or employee of the shipowner. Such a long-standing rule requires a shipowner to secure insurance at an appropriate rate to protect itself against damage of the type suffered here. *Transpacific Carriers Corporation v. Tug ELLEN F. Mc-*

*ALLISTER, supra* at 375. In *Trinidad Corporation v. S. S. SISTER KATINGO*, 1967 A.M.C. 1561 (S.D.N.Y.1967), the Court in upholding a pilotage clause made the following finding (at 1574): [5]

The economic facts demonstrate the reasonableness of a tug company's refusing to accept the responsibility, and the potential liability, of assuming the duties involved in navigating or piloting a ship using or having available her own propelling power. The potential liabilities are too heavy to be accepted having in mind the relatively low charges made for the tug services and the multi-million dollar liabilities to which the tug company would be exposed if it undertook to have its employee navigate or pilot the vessel.

Such a principle is particularly applicable in this case. Here Hagen, the shipowner, was apparently aware of the pilotage clause and did in fact have insurance coverage for damage to the OTTO PORR's hull caused by the negligence of a pilot and docking master like defendant Gentile. Hagen's insurance claim has been paid, and the insurer as subrogee has been made a use plaintiff in this action.[6] Presumably the rates charged by Baker-Whiteley for towing services reflect the fact that the tugboat company would not be providing insurance coverage for pilotage but that the shipowner would have to pay for such insurance itself. *See* A. Parks, *Law of Tug, Tow & Pilotage*, 484, 486 (1971).

Recognizing the vitality of the *Sun Oil* doctrine as they must, plaintiffs claim that it is not applicable in this case to exempt defendant Baker-Whiteley from liability for various reasons. Plaintiffs argue (1) that defendant Baker-Whiteley is liable for damages because it was negligent in furnishing an incompetent docking master and in failing to properly train such docking mas-

---

5. The first part of this Opinion is likewise reported at 280 F.Supp. 976, but not the Court's findings of fact and conclusions of law.

6. The evidence does not indicate what part of Hagen's total claim has been paid by its insurer.

ter before he assumed his duties on the day in question; (2) that defendant Baker-Whiteley is not entitled to the protection of the pilotage clause because defendant Gentile's decision as to how and where he would turn the OTTO PORR in the Ore Pier channel was made before he boarded the vessel and became her pilot; and (3) that defendant Baker-Whiteley is liable for damages because it breached the implied warranty of seaworthiness owed by the tug RESOLUTE to the OTTO PORR. This Court concludes that there is no merit to any of these contentions.

Plaintiffs do not attack Captain Gentile's general competence as master of a tug operating in the Port of Baltimore or as a docking master in that Port. The evidence indicates that Captain Gentile has been employed by Baker-Whiteley for over thirty years on tugboats, that he has served as a tugboat captain and a docking master for over twenty-three years, and that he holds all the required licenses. However, plaintiffs argue that Captain Gentile was not competent to undock the OTTO PORR from the Curtis Bay Ore Pier because of a specific lack of knowledge of local conditions.

The evidence produced at trial does not support such contention. The Ore Pier and its surrounding waters were well known to Captain Gentile. He had taken ships in or out of the access channel many times before April 26, 1973. His testimony showed that he was familiar with and regularly used the navigational charts which showed the depth of the water in the vicinity of the Ore Pier and the Coal Pier. The negligence which caused the grounding was not Captain Gentile's failure to familiarize himself with these waters but was in fact the result of a miscalculation on his part as to the size of the vessel itself and its exact location in the channel during the turning maneuver. Had he in fact turned the vessel close to the Coal Pier itself or beyond the Coal Pier, there was ample water to complete the maneuver successfully, and the evidence shows that he was aware of these facts on the date in question.

Plaintiffs further suggest that Baker-Whitley did not train Captain Gentile properly in the performance of his duties as a docking master at this specific location and that such failure would amount to negligence under all the circumstances here. If the standard of due care suggested by plaintiffs were to be applied by this Court, few if any tug companies would be able to satisfy such a requirement. Plaintiffs contend that defendant Baker-Whiteley should have had a training program for its docking masters covering each location in the Port where they might operate and that it should have periodically tested its tug captains to ensure that they had knowledge of local conditions. This Court concludes that the practical day-by-day experience which Captain Gentile had acquired during the thirty years that he had served on and commanded tugboats operating in the Port of Baltimore with its 45 miles of shoreline and many marine terminals, together with his justifiable reliance upon available charts, was more than sufficient to satisfy any duty imposed on Baker-Whiteley to furnish a competent docking master. In any event, the sole proximate cause of the damage to the OTTO PORR was the negligence of Captain Gentile occurring while he acted as pilot and docking master of the vessel during the undocking operations and not any negligent failure on the part of Baker-Whiteley to take reasonable steps to assure his competency to so act.

It is next argued that the pilotage clause would not protect Baker-Whiteley here because the negligent decision to turn the vessel in the Ore Pier channel was reached before Captain Gentile went aboard the OTTO PORR and took over as her pilot and docking master. Again, the credible evidence does not support this contention. The decision concerning where in the access channel the turning maneuver would be executed

was not made until Captain Gentile was on board the OTTO PORR and was actually under way. As the vessel was backing away from the Ore Pier, the stern tended to fall off to port, and Captain Gentile decided to turn the ship where he did because he feared that the stern would not clear the end of the Coal Pier. However, he made a miscalculation as to his exact location and executed the turning maneuver at a spot in the channel where there was insufficient water for completion of the turn without having the vessel strike the bottom. Sufficient water existed for the safe completion of the full turning maneuver at a location close to the Coal Pier. Alternatively, Captain Gentile should have called for the assistance of another tug and turned the OTTO PORR around beyond the Coal Pier in the Curtis Bay Channel itself.[7]

An argument like the one advanced here was rejected by the Court in *A/S ATLANTICA v. Moran Towing & Transportation Co., supra.* In upholding a similar pilotage clause, the Court there rejected the plaintiffs' contention that the clause would not relieve the tugboat company of liability because the plan for turning the vessel had been made before the docking master had in fact become the pilot. At pages 162–163 of that opinion, the Court said the following:

> If he [the pilot] acted negligently in making his final decision and in the subsequent implementation of the plan, his negligence was within the scope of the pilotage clause. (Footnote omitted)

A similar argument was also rejected in *Farrell Lines, Inc. v. BIRKENSTEIN, supra,* in which Judge Friendly, sitting by designation as a District Judge, said the following (at 506):

> This places the duty of decision too early; there was no reason why Cray [the pilot] should have formulated a fixed view until he had all the facts.

Moreover, his failure to formulate a view was without consequence; what mattered was what he did when he boarded the *Birkenstein.* If Cray then neglected to make sound recommendations, it was a failure after he went on board, "in respect of the handling of such vessel," and thus within the pilotage clause.

As in the *BIRKENSTEIN* case, Captain Gentile came aboard as pilot and talked things over with the OTTO PORR's master, Captain Fenske, before any final decision was reached for turning the vessel. The negligence resulted from what Captain Gentile did on board, not from what he may have had in mind before he came on board. In any event, the grounding was caused not by any faulty plan but by orders issued by Captain Gentile when the final decision for the maneuver had been reached on board the OTTO PORR. This constituted the "act of omission" of the pilot within the meaning of the pilotage clause. *BIRKENSTEIN, supra* at 509.

In seeking to impose liability on Baker-Whiteley in spite of the pilotage clause, plaintiffs rely on *American South African Line, Inc. v. Sheridan & Company, Inc.,* 1936 A.M.C. 287 (E.D. Pa.1935). But the facts of that case differ markedly from those here. The Court there found that the damage was caused by negligence on the part of the tugboat company in not supplying a sufficient number of tugs or tugs with sufficient power to hold the ship against the wind and tide. There was no finding, as here, that the damage was caused by a negligent act or omission of the pilot occurring while he was aboard the ship.

Finally, plaintiffs argue that Baker-Whiteley is liable because it supplied an unseaworthy tug. It is asserted that the tug RESOLUTE was unseaworthy because it was manned by personnel who were incompetent and inattentive to

7. Baker-Whitely's tug COLUMBIA was in the vicinity and could have been called by Gentile to assist.

their duties and who negligently failed to act to avoid the grounding.

■ It is established law that a tugboat company may not under a towing contract furnish an unseaworthy tug and that a shipowner may recover for the breach of the implied warranty of workmanlike performance assumed under such a contract. *Tebbs v. Baker-Whiteley Towing Co.*, 271 F.Supp. at 541. But here the evidence does not indicate that the RESOLUTE was unseaworthy in any respect or that there was any breach of the warranty. Both Captain Gentile and Mate Freburger were competent, experienced tug personnel. The tug was adequately manned, and there is no claim that any failure of its equipment or appurtenances had anything to do with the grounding. The negligence of Captain Gentile occurred while he was acting as pilot and docking master of the OTTO PORR, and under the pilotage clause, he was then the borrowed servant of the shipowner. As discussed hereinafter, defendant Freburger, who was acting master of the RESOLUTE while defendant Gentile was aboard the OTTO PORR, was not negligent in complying with orders relayed to him by defendant Gentile who commanded the entire operation as pilot of that vessel.

■■ Even were this Court to find that the grounding was caused or contributed to by a negligent act of defendant Freburger, such would not in itself make the RESOLUTE unseaworthy. Unseaworthiness is a condition of the ship, her appurtenances, her cargo or her crew, which does not ordinarily arise because of an isolated, personal, negligent act. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499–500, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); *Barlow v. Ugland Management Company*, 353 F.Supp. 1046, 1048–49 (D.Md. 1973). As found herein, the sole proximate cause of the grounding was the negligence of Captain Gentile while he was on board the OTTO PORR and acting as her pilot and docking master during the undocking operation.

III

*The Claim against Defendant Gentile Individually*

■ Whereas the pilotage clause operates to relieve Baker-Whiteley of liability, it has no such effect insofar as plaintiffs' claim against defendant Gentile individually is concerned. However, there is another exculpatory clause contained in a separate agreement which defendant Gentile contends is controlling as to such claim and exempts him from personal liability resulting from his negligence as a docking master during this operation.

■ Docking masters in the Port of Baltimore present the master of a vessel with a so-called "Docking Master's Ticket" to be signed and returned to the individual rendering the services. In this case, such a ticket was presented to Captain Fenske of the OTTO PORR and was signed by him. This Court finds under the facts here that a contract existed between Hagen and defendant Gentile individually whereby Gentile would render services to the vessel as a docking master. Hagen's ships and Captain Fenske himself had been in the Port of Baltimore on several occasions prior to April 26, 1973 and had on such occasions used the services of a docking master. Captain Fenske had previously signed a number of docking master's tickets such as this one, and both he and the shipowner knew of this exculpatory clause. *See Federal Steam Navigation Company v. Tugs SAVANNAH and ROBERT W. GROVES, supra* at 1298.

The exculpatory clause in question, which was a part of the agreement between plaintiff Hagen and defendant Gentile, provides as follows:

1. PILOT NOT TO BE HELD PERSONALLY LIABLE—The services of the pilot while participating in directing the navigation of a vessel from on

board such vessel or from elsewhere are accepted on the understanding that neither the owners nor the operators of a vessel making use of or having available her own propelling power will assert any personal liability to respond in damages, including any rights over, against the pilot for any damage sustained or caused by the vessel, even though resulting from the pilot's negligence, in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting services and/or in respect to the handling of such vessel; except, however, the personal liability or rights over against the pilot for his willful misconduct or gross negligence.

 The principles of the *Sun Oil* case would appear to apply equally to a clause exempting a docking master from personal liability as well as to a pilotage clause in a contract with a tugboat company. This Court concludes that the clause set forth hereinabove therefore exempts defendant Gentile from personal liability resulting from his negligence in performing services as docking master while he was on board the OTTO PORR on April 26, 1973. *See Sun Oil Co. v. Dalzell Towing Co., supra; United States v. S. S. PRESIDENT VAN BUREN, supra; A/S ATLANTICA v. Moran Towing & Transportation Co., Inc., supra.*

Indeed, the rationale for exculpating a party from liability for negligence would appear to have even greater force in the case of a docking master individually than in the case of an employee of a tugboat company acting as pilot. Defendant Gentile and other tugboat captains in the Port of Baltimore are members of an Association known as "Docking Masters, Port of Baltimore." However, the use of a docking master is not compulsory in the Port.[8] Thus, many vessels using Port facilities do not use docking masters and therefore do not avail themselves of the services offered by the Association. When such services are used, an agreement with the shipowner is entered into as set forth in the docking master's ticket, and the Treasurer of the Association bills the shipowner, or its agent, after the docking or undocking has occurred. The charge is nominal and amounted to some $20 in April 1973.[9] Even this small amount is not paid in full to the docking master himself but is placed in a fund to be distributed at a later date proportionately among all the members of the Association.

Quite obviously, an individual member of the Docking Masters Association like Captain Gentile is not paid enough for such services to enable him to carry insurance to protect himself from personal liability for negligence occurring during the docking or undocking of a large vessel. A docking master spends but a few minutes on board the vessel. Yet the potential liability he faces for a negligent act is extensive because of the size and value of ships entrusted to his care for this brief period. The small charge paid by the shipowner for a docking master's services would indicate that the shipowner has recognized the validity of the exculpatory clause contained in the agreement and has undertaken to provide its own insurance against risk of loss occurring because of the docking master's negligence. As noted hereinabove, plaintiff Hagen did in fact carry such insurance.

 Finally, plaintiffs argue that an exculpatory clause of this sort is unconscionable and contrary to public policy. Were some other industry involved, such a contention might well have merit. But as the decisions of the Supreme Court and the other cases cited herein-

8. Plaintiffs' reliance on § 10 of Article 74, Annotated Code of Maryland (1970 Repl. Vol.) is misplaced. That statute does not compel the hiring of a docking master during berthing or unberthing operations.

9. The rates change every few years and are the subject of negotiation between the Steamship Trade Association and the Docking Master's Association.

above clearly state, there is nothing unconscionable about a clause such as this one in the shipping industry, in which such exculpation is entirely consistent with public policy.[10] It is thus concluded that defendant Gentile, even though negligent, is relieved of personal liability in this case by the clause in question.[11]

## IV

### *The Claim against Defendant Freburger Individually*

Plaintiffs seek to impose liability on defendant Freburger individually because of his alleged negligence while he was acting as master of the tug RESOLUTE during the turning operation which led to the grounding.[12] It is contended that defendant Freburger, when he was ordered to begin turning the OTTO PORR in a counterclockwise direction while in the Ore Pier access channel, should have known that such a maneuver would place the vessel in jeopardy.

The evidence in this case supports no finding of negligence on the part of defendant Freburger. Like defendant Gentile, defendant Freburger had been employed for over thirty years on tugboats, as mate and as deckhand. He was licensed to operate a tug and had often served as acting master of one prior to April 1973. The decision as to where the OTTO PORR was to be turned was made by defendant Gentile himself after he had gone aboard the OTTO PORR. Gentile on the vessel was in command of the entire operation and radioed orders to Freburger on the tug. Gentile was in a much better position on the bridge of the OTTO PORR to make the necessary observations and decisions than was Freburger aboard the RESOLUTE. Indeed, the tug was so positioned at the start of the turning operation that Freburger's range of vision was severely limited. In *Academy Tankers, Inc. v. Steuart Transportation Co.*, 441 F.2d 724 (4th Cir. 1971), the Fourth Circuit affirmed a decision of Judge Watkins in this Court exonerating a tug and her owner from liability for damages caused by the collision of a tanker with a pier. The Court found (at 725) that even assuming the master of a tug has a duty to give warnings of the dereliction of the ship it is assisting, the tug's crew was not in a position to see the pier and its master did not know the tanker was on a collision course.

In this case, defendant Freburger was in no position to determine the exact location of the OTTO PORR and the tug RESOLUTE in the access channel. He had no reason to give any warning to defendant Gentile or to assume that any of Gentile's orders were obviously dangerous or manifestly wrong. The grounding was caused by what Gentile did and ordered, not by what Freburger did or failed to do in carrying out such orders. Plaintiffs' proof has failed to establish any lack of due care on the part of defendant Freburger and has further failed to establish that any act or omission of Freburger's caused the grounding.

## V

### *Conclusion*

For the reasons stated, judgment is hereby entered in favor of the defend-

10. The agreement here was a voluntary one, as the facts disclose no inequality of bargaining position between plaintiff Hagen and defendant Gentile. Hagen was not compelled by law or otherwise to employ a docking master in the Port of Baltimore, and on some occasions prior to this incident, ships owned by Hagen had not engaged one.

11. Plaintiffs further argue that this clause does not exempt Gentile from liability for his gross negligence. But there has been no proof of gross negligence on his part. His error in judgment amounted to simple negligence and nothing more.

12. It is also claimed that Baker-Whiteley is liable because of Freburger's negligence. This contention fails for the same reasons set forth in the discussion concerning Freburger's individual responsibility.

ants, with costs. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this Opinion, whether or not expressly so characterized.